My name is Anne Wallstrom. I'm an attorney with the Federal Defenders of Eastern Washington and Idaho. And I'm here today on behalf of Mr. Carpenter. And I would like to reserve one minute for rebuttal. In this case, your honors, police officers approached the motel room in which Mr. Carpenter was staying and conducted a knock and talk. And police officers have the authority to go up to a motel room or any door and knock on the door, as long as they do not use a show of authority to command an individual to open up the door. But here, under the circumstances, the officers' persistent actions transformed what should have been and what began as a consensual encounter into a non-consensual encounter, where the occupants did not voluntarily consent to open the door. A reasonable person in the position of Mr. Carpenter would not have felt free to ignore the officer's request to enter. In this case, the officer said. But the problem is that Carpenter didn't, as far as the records show, Carpenter didn't play any part in opening the door. That was the woman, right? There was another person in the room, a young woman. She did. She opened the door. She was the one who opened the door, yes. And is there any showing that she opened the door because Carpenter had told her to do so based on his conversation on the balcony? There was a conversation on the balcony. And the woman was in the room. And once the officers entered the room, they were from the vantage, looking in the room at the vantage point where she had been standing. And they were able to see Mr. Carpenter standing on the balcony. So this young woman. He was still outside on the balcony when the officers entered? When they entered, he had stepped inside of the room. He had stepped inside. He had stepped inside the room. But they could see the door and the balcony from where they were standing. And so. But could Ms. York hear the conversation between Carpenter and the officers? Ms. York did not testify at this hearing. However. Neither did Carpenter. Neither did Carpenter. So there was a conversation on the balcony and a conversation at the door. And you want us to infer some communication that ties the balcony conversation to the door conversation. There was testimony that can show that Ms. York, that inference can be made. The officer who was down below outside of the balcony stated that he could hear voices from inside of the motel room. And Ms. York would have been able to see Mr. Carpenter step out onto the balcony. Mr. Carpenter is a very large man. He's 6 foot 8. And when he stepped out onto the balcony, he raised his hands. And so whether or not she could have heard, she saw Mr. Carpenter step out onto that balcony and raise his hands. And who else? Was the court required to draw that inference? Was the court required? Was the district court required to draw that inference based on the records that it had before it? I believe so, Your Honor. I believe there was sufficient evidence. What compelled it? I mean, you say she could have. But why did the district court decide that she did or had to? The district court relied heavily on the fact that she did not testify. And that's true. She did not. And that is true. She did not testify. However, once the officers were in the room standing where she would have been standing, they were able to see the balcony. And so someone in that room would have seen Mr. Carpenter step out onto the balcony. But besides what happened on the balcony, the first circumstance that makes this extremely persistent actions on the part of the officers is the amount of time that they were standing at that door knocking. The officers were knocking on a motel room door for three to five minutes. And that's undisputed. And as they were knocking, they would knock, identify themselves as the Yakima Police Department, state we need to talk to you. We have some concerns. And then they would listen. And then they would knock again. And this happened several times that they were knocking for such a period of time on a motel room door. And to knock for a period of three to five minutes is excessive. The occupants of the room could hear that someone was at the door. And they had an opportunity to respond. And the officer's message was they were not going to go away until someone answered the door. And to support this argument, I cited to the Supreme Court case of United States versus banks. And in that case, it was in the context of a knock and announce circumstances. And in that case, the Supreme Court stated that it may take several minutes for someone to answer the door to a townhome or to a home. But for a motel room, it could take as little as five seconds for someone to come to the door. And here, the officers spent well beyond five seconds of knocking at this door. And in cases where the Ninth Circuit, when this court has found that officers have not used excessively persistent actions to get people to answer a motel room door, the officers have not knocked for this amount of time. There's been a short amount of knocking, nowhere in the range of three to five minutes. And what happened on the balcony is something, again, that the court must consider. What happened to Mr. Carpenter? Because he stepped outside. And there was an officer outside who had him raise his hands, drew a weapon, and pointed it at Mr. Carpenter. The first words out of this officer's mouth was an order. He ordered him to raise his hands. The government has tried to characterize this officer's statements to Mr. Carpenter as responses to Mr. Carpenter's questions and questions themselves. But this is not true. The officer himself admitted that he did not answer Mr. Carpenter's questions and that he wanted Mr. Carpenter to do what he was told. And this officer told him, told Mr. Carpenter, to please have your girlfriend open the door, is how he put it. But with a weapon pointed and drawn at someone, this is not a question. This is a command. And this officer stated that it was possible that Mr. Carpenter turned and said something inside of the room. And that he stated on cross-examination that Mr. Carpenter must have said something because the door eventually opened. Not eventually. It was rather quickly. It was a matter of seconds, I think, wasn't it? When the officer outside told Carpenter, tell your girlfriend to open the door. There's some police out there or something or other. He had previously said that, I think. Tell your girlfriend to open the door. And then the next thing he heard was a telephone contact or an intercom from the officer saying the room's secure. Isn't that right? That is true, that there was a short span of time. OK, I have officers outside for three to five minutes hanging on the door. Open up. We're officers. We want to talk to you. No response. Then outside, with a gun pointed at Carpenter, just tell your girlfriend to open the door. And the door opens. And she does open the door. And the length of time that goes on between the tell your girl to open the door and the door opening, the statement, I can't remember whether it was seconds or whatever in his testimony that he said right away because there had been a long fight. As soon as he said, open the door, then that ended the knocking outside. Apparently, the door opened. But what we don't know here is whether after the three to five minutes, she said, I might as well open the door. My god, these cops aren't going to go away. So she decides on her own to open the door. Or whether she's 16 years old, she says, the big guy, the six to eight fellas has opened the door. And so she opens the door. We don't know which of those it is. Under either of those circumstances, though, Your Honor, the officer's actions have amounted to excessive, persistent action that makes the opening of the door non-consensual. If she opened the door because he turned to her and said, open the door, he did that because there was an officer down below with a weapon. Yeah, but we don't know whether that happened or not. She did not testify. But we can draw an inference from the amount of time there had been knocking for several minutes. And then as soon as the statement is made, shortly thereafter, the door opens. Or if she decided that these officers have been knocking for three to five minutes on my door, they're not going to go away. Again, that is too persistent. That is action that makes this non-consensual because the message that they sent with this knocking for such a period of time was they were not going to leave. OK, now the district court said that he would not make an inference as to what was said between the two of them. Just with regard to that, is that a factual finding to which we give deference? I believe that is a factual finding. What about when he says they were out there for three to five minutes, but that is not an excessive amount of force? What kind of a finding, what kind of a determination is that? Again, I believe, and I'm going into my time for rebuttal if I may answer this question. Answer the question, but you're still going to be using up your time. OK. A factual finding, voluntariness is a factual finding that is reviewed for clear error. But whether an investigative, or whether a stop turns into an investigative stop is a question of law and fact that this court can review de novo. And so I think that goes into the realm of de novo review. OK. Great. Thank you. I've used up my time. Thank you. Thank you. May I please the court? My name is James Haggard. I'm an assistant US attorney in the Eastern District of Washington. And for the court's information, I was the assistant US attorney who handled this matter at the district court level, as well as for a brief. What was your name, sir? James Haggard. Haggard. Haggard. Gotcha. I think the court hit on one of the key issues in this case. And that is, and the district court addressed it also. And that is, the evidence that was presented at the hearing contained nothing about any contact between Mr. Carpenter and Ms. York that occurred inside that room. And the court said, I am not going to automatically infer there was a conversation, or that Ms. York saw the officer out there, or that Mr. Carpenter brought it to her attention and said, go open the door. There's a policeman out there with a gun. And he wasn't going to make that, because there was no evidence. And that would have been incorrect for him to have gone into that speculation. Now, Ms. Wallstrom said that Ms. York did not testify at the hearing, so we don't know about it. Mr. Carpenter, in knowing that he has the right to go to this hearing and to present evidence, Mr. Carpenter also had the opportunity to raise that issue or to present that to the court, and chose not to do that. So I don't think you can answer the question by saying Ms. York didn't testify, because Mr. Carpenter, without any peril to himself, could have testified and raised the issue, forcing the government, then, to have to do some other action. But he didn't. Refresh my memory on this. I remember there's a law on this. But if you do testify at a suppression hearing, that testimony can be used against you at trial, can't it? It cannot be used against you as direct testimony. It could be used if you were. Impeachment, if you got up on the stand and at trial, testified differently to that, then it would be. But there's really, in this case, there would be no peril if you told the truth and you presented it, then the government could not use it unless you then opened up the door for the government to use it. So he could have raised the issue. Again, even the defense in this case, the argument really is, Your Honor, we want you to speculate. We could have what occurred in the room. What we do know is that when the officers knocked on the door, if in the transcript is, Officer Fowler testifies that Detective Andrews, Detective Barrett say, we're knocking. And then the knock occurs. And the next thing Officer Fowler sees is the defendant come out on the balcony and begin looking in a manner which Officer Fowler testified appeared to be someone looking for a way to get out. So when the defendant talks about the amount of time at the door, we look at the totality of the circumstances. There's a knock on the door. And the first thing that the defendant does is exit the room at the balcony and look in a way as described as a way to get out of the room. So when we say, well, they knocked for three to five minutes, and they heard him and didn't do anything, that's incorrect. He did do something. He took this initial action. And then we have this involvement, this contact. That's the opposite of consent. His first action was to run away. That's not an action that indicates that they wanted to let the police in. Correct. But remember, the argument that the defendant makes in his brief is that three to five minutes is too long, that they would have known after, in fact, using the banks analogy, saying, is it five seconds? At the end of five seconds, you would have known whether they wanted to answer. Well, you would not have known in Mr. Carpenter's case because Mr. Carpenter is doing something else. No, no, I thought the facts were that there were officers outside, and there were officers that were coming up the stairs to knock on the door at the same time. They had two different sets of officers. That's why they were, one set didn't really know what the other set was doing. No, they were in radio communication. What happened was that Agent Barrett of DEA, Detective Andrews of the City County Narcotics Unit, an officer, I don't want to abuse his name, but there was an officer from White. They went to the door of the room, and they stood outside and tried to smell the odor because there had been a report from the manager that there was an odor and a fan. They were attempting to do that. So they were standing. During this three to five minute period that we're talking about, they're standing there making no contact, but just trying to take in hearing noise. And they hear people moving, but they don't smell anything. At that same time, Officer Fowler and I believe Officer Helms go to the back of the motel for security purposes for the very reason that they don't want someone taking flight. And then there's radio communication, and Detective Andrews advises Officer Fowler, we're knocking. They begin to knock at the door. It is just almost immediately after that that Mr. Carpenter exits onto the balcony. And so what we have is a situation that the three to five minutes, is that too long? You look at the totality of the circumstances in this case, you have someone who's taking action where he's decided, initially, I'm not going to respond to it. I'm going to try to see if I can get away. But then he goes back into the room, and as was indicated, that Ms. York goes to the door. And we have no information about what occurs. But as this contact with Mr. Carpenter is going on, eventually, almost immediately after that, Ms. York opens the door. So the question is, is this court going to speculate? The district court found that they weren't going to, that the evidence said that we can't find any effect on the contact between Mr. Carpenter and Mr. and Officer Fowler had an effect on Ms. York. And what the? Let me throw out that I think it's a very close case. And I'll tell you the issue that troubles me the most, because, OK, so Mr. Carpenter's on the balcony. Guns are drawn. Guns being drawn is usually a sign that the subsequent actions aren't voluntary. He raises his hands. His girlfriend, I can't remember her name, is? York. York, Ms. York, sees this. And then the officer, well, the officer first orders him to put his hands where he can see them. Then he says, please ask your, according to the officer's own report, he says, I asked Carpenter if he would have his girlfriend answer the door. Well, I mean, I don't think it's speculation when you see Carpenter raising his hands in response to the gun and saying that. I mean, there's two arguments. What is the inference that can be drawn? Is it that he didn't tell his girlfriend? Or the alternative possibility is that the girlfriend just heard it. But still, it starts with the gun to Carpenter to the girlfriend. And she hadn't answered the door before then. And then this sequence of events prompts her to go to the door and open the door. So to me, I have a problem separating the gun in the balcony and what was said there from Ms. York's answering the door after she had refused to answer it for three to five minutes before. So if you can respond to that, because that's to me the turning point. Let's make it clear that if you read the Officer Fowler, what he tells Mr. Carpenter is put your hands up so I can see them. There is no testimony that Mr. Carpenter stood on the balcony like this. Mr. Carpenter is a rather large man. And therefore, to put his hands, he could have his hands up like this. His size and his bulk out on the balcony, Officer Fowler could see it. But someone behind Mr. Carpenter, because of his bulk and his size, would not be able to see that. Second is, there is no evidence whatsoever. And remember that the unique issue of what occurred inside that room was the defendant and Ms. York. They're the only ones who could do that. Ms. York was never called. And the defendant never raised it. So what you're asking is, is you made the comment that she saw it. In fact, we don't know that she saw it. There's alternative inferences. But I think, I mean, is there any, can these facts support the inference the other way? I mean, is there any inference that you didn't either come down to she saw the sequence of events on the balcony, there was a gun pointed at Mr. Carpenter? Is there any inference that can be drawn permissibly from that evidence? Well, I think the thing is that I can speculate for you. Ms. Carpenter was in the bathroom when Mr. Carpenter went out on the balcony. Once the door was knocked, I mean, Ms. York went into the bathroom where she was in the bathroom at the time. She's unaware of what's going on. She comes out. She hears the knock on the door. By this time, Mr. Carpenter has come back into the room. She goes and answers the door. Mr. Carpenter, as the testimony was, he went into the corner of the room. There was a black bag, which they didn't want to search. I could speculate that at the time Mr. Carpenter went out, Ms. York, if they were using drugs, or there was a gun laying around, or it was a tubing, that she was packing it into the bags while Mr. Carpenter. She could have been washing the door. I mean, so I think it's. Was there any testimony that after the officer said to Carpenter, ask your girlfriend to open the door, that he turned and obviously said something to someone inside? Or could they tell? Officer said that there was noise coming on. He didn't know if it was the television or someone else. And also, remember that the first. Could the officers outside see Carpenter turn on the balcony as though he were speaking to someone inside? I don't believe that there was any testimony. The other one is the fact that Mr. Carpenter asked first what's going on. And he said, there are detectives at the door. If you open the door, you can find out. That was the first thing. And then it was, well, who else is in there? Your girlfriend. Well, you could have your girlfriend call. So he was first asking what was going on before the girlfriend statement came up. All right, thank you, counsel. We're over your time. Counsel, for defense, I'll give you a little bit of time because the government went over substantially. You have a minute. Thank you. First, Your Honor, I was looking. On cross-examination, I asked the officer who was down below, did Mr. Carpenter turn and gesture or anything? And at one point, he did indicate that. And then when I asked him again on page 80 of the excerpt, he said, I can't recall. But he must have mentioned to her to open the door because the door opened. That's the officer's testimony? What page is that of the record? Page 80 of Officer Fowler's testimony. And again, I believe the Court raises an excellent point, that there is this inference can be drawn in the sequence of events. There's a gun drawn. Mr. Carpenter steps out on the balcony. He is ordered to put his hands up in the air where Officer Fowler can see them. And shortly thereafter, the door opens. And under either inference of whether Ms. York opened the door simply because they had been knocking for such a long time or because the gun was drawn and pointed at Mr. Carpenter, if I can complete my sentence, under either circumstance, this was excessive, persistent actions on behalf of the officers that made the consent involuntary. Thank you. Was that a testimony in the excerpt of record? Yes. It's on page 80 of the excerpt of record. 80. All right. Thank you. All right. United States v. Carpenter is submitted.
judges: Thompson, T. Nelson, Wardlaw